**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
Orlando Division

GOODLEAP, LLC, a California limited liability company,

Plaintiff,

v.

SOLAR CANCELLATION RESOURCE CENTER LLC, a Wyoming limited liability company; and CONSUMER ADVOCACY LAW GROUP, a Nevada law firm,

Defendants.

Case No. 6:26-cv-01072-PGB-NWH

**GOODLEAP'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND TO TRANSFER VENUE**

## I. INTRODUCTION

This is not the first time the architect of this scheme has been before a court in this District attempting to defend it. Richard Fonbuena built a business that sold consumers a guaranteed, attorney-backed escape from their timeshare contracts, collected thousands of dollars in upfront fees, and instructed those consumers to stop paying. Twice he agreed to permanent injunctions barring that conduct, including in this District. FAC ¶¶ 2, 55–57. He then aimed the same operation at solar lenders, through Defendants. *Id.* ¶¶ 6, 57. The corporate names are new. The playbook is not.

The machinery is unchanged. Defendant Solar Cancellation Resource Center LLC ("SCRC"), a marketing company that employs no lawyers, advertises "legal" loan-cancellation services promising a "100% FAVORABLE OUTCOME" "[b]acked by licensed attorneys." *Id.* ¶¶ 3, 26–39. SCRC charges $4,500 to $9,000 or more up front, tells borrowers that ceasing payment is "part [o]f the process" that "helps [lenders] settle faster," and directs them to route every communication with their lender through SCRC. *Id.* ¶¶ 40–47. Defendant Consumer Advocacy Law Group ("CALG"), Fonbuena's firm, supplies the letterhead: it accepts the referrals, lets SCRC manage the clients, and mails form letters designed to create the false impression that legal proceedings are underway. *Id.* ¶¶ 6, 48–54. It works. Nearly one hundred GoodLeap borrowers have defaulted within weeks of GoodLeap's receipt of a

CALG letter sent purportedly on their behalf. *Id.* ¶¶ 12, 64–65. But instead of securing cancellation of their loans, the defaults have done nothing but harm those borrowers by, for example, driving down their credit scores. *Id.* ¶ 46.

Courts in this District know this playbook and have repeatedly refused to dismiss materially identical claims. *See, e.g.*, *Wyndham Vacation Ownership, Inc. v. Miller*, 2019 WL 5394074, at *4–8 (M.D. Fla. Oct. 11, 2019) (Byron, J.); *Wyndham Vacation Ownership v. Reed Hein & Assocs., LLC*, 2019 WL 3934468, at *4–8 (M.D. Fla. Aug. 20, 2019); *Diamond Resorts Int'l, Inc. v. Aaronson*, 371 F. Supp. 3d 1088, 1102, 1115 (M.D. Fla. 2019). Defendants have no answer to those decisions, and instead simply recast the fifty-page complaint as a garden-variety "dispute between a lender and its borrowers" who happened, on their own, to stop paying. Their lead argument is that GoodLeap's customers "independently" decided to default. That is not an argument about the sufficiency of the pleadings. It is a competing factual narrative, and it asks the Court to disregard the multistep scheme GoodLeap actually pleaded and to draw inferences in the movants' favor. Rule 12(b)(6) forbids both. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). Defendants' remaining arguments repeat the pattern. They misstate the Lanham Act's materiality test, ignore the alleged financial and operational entanglement between SCRC and CALG, apply Rule 9(b) to theories that do not sound in fraud, ask the Court

to reject the settled rule that lost profits are recoverable under FDUTPA, and misread the Florida authorities governing the unauthorized practice of law.

Defendants' fallback request to transfer refutes itself. Defendants cannot agree on whether Arizona or Nevada is more convenient, and under either proposal, at least one Defendant and its witnesses would travel. Nor can Defendants escape their own conduct. They built a website titled "Florida Solar Contract Cancellation," run a Facebook page for Florida homeowners, advertise that they serve homeowners in every county in this District, solicit Florida clients, and concede that CALG employs two Florida attorneys "with knowledge of the facts relevant to this action." FAC ¶¶ 19, 21, 39; Mot., Ex. A ¶¶ 4, 7. Venue is proper here, the relevant factors overwhelmingly disfavor transfer, and the motion should be denied in full.

## II. SUMMARY OF FACTUAL ALLEGATIONS

GoodLeap finances solar systems and other sustainable home improvements. Florida homeowners make up nearly 20% of its solar loan portfolio. FAC ¶¶ 7, 22–24. Written, enforceable Loan Agreements govern GoodLeap's relationships with its customers and fix those customers' payment obligations. *Id.* ¶¶ 23–24. Those ongoing customer relationships are central to GoodLeap's business and reputation. *Id.* ¶¶ 7, 25.

Defendants operate a coordinated scheme engineered to sever GoodLeap's relationships with its borrowers and induce those borrowers to stop paying. *Id.* ¶¶ 1, 9. SCRC, a marketing company with no attorneys, advertises "legal" services to help homeowners "break free—legally and permanently" from their solar contracts, falsely promising "100% favorable outcome[s]." *Id.* ¶¶ 3, 26–27, 29–30, 33, 37–38. Advertising examples include:










SCRC's advertising targets Florida residents by name. SCRC maintains a website titled "Florida Solar Contract Cancellation" and a Facebook page dedicated to Florida homeowners, and it represents that it "serves homeowners throughout Florida." *Id.* ¶¶ 19, 39. SCRC's advertising targets GoodLeap by name as well, including through blog posts addressed to those who "owe a debt

to a lender like GoodLeap" and warnings that borrowers "cannot 'DIY' a cancellation against companies like GoodLeap" without SCRC's help. *Id.* ¶¶ 60–61. To manufacture credibility, SCRC represents on its website that it has been "featured on" more than fifteen major national media outlets, including The Wall Street Journal and Forbes. None of that is true. *Id.* ¶ 31.

Once a homeowner responds, SCRC collects an upfront fee of $4,500 to $9,000 or more and instructs or encourages the homeowner to stop making loan payments and to cut off communication with the lender, on the false premise that ceasing payment is a necessary "part [o]f the process" that "helps [lenders] settle faster." *Id.* ¶¶ 40–47. Consumers have told the Better Business Bureau the same thing. One reported that an SCRC representative "pretend[ed] to be a lawyer" and sought $8,000 to cancel a solar contract. *Id.* ¶ 41. Another said SCRC advised that "stopping my monthly payments was part [o]f the process" of loan cancellation, only to have their credit "destroyed." *Id.* ¶ 44. A former SCRC trainee posted that SCRC "tell[s] the customers to stop paying their solar payments which can immediately cause your credit to tank." *Id.* ¶ 45.

CALG supplies the law-firm veneer. CALG accepts SCRC-generated referrals, permits SCRC to manage all client communications, and transmits boilerplate letters to lenders that are designed not to obtain legal relief but to create the false impression that legal proceedings are underway. *Id.* ¶¶ 6, 47–54. CALG also falsely represents that it has been "seen in" reports by major

outlets like CNN. *Id.* ¶ 32. And CALG's founder, Richard Fonbuena, has run this playbook before. Having twice agreed to permanently enjoin the practice in the timeshare exit industry, once in a proceeding in this District, Fonbuena found a new target in GoodLeap and other solar lenders. *Id.* ¶¶ 2, 55–57.

The scheme is working. Nearly one hundred GoodLeap customers have defaulted right around the time CALG transmitted to GoodLeap a form letter purportedly on their behalf. *Id.* ¶¶ 12, 64. GoodLeap continues to lose loan payments, incur servicing costs attempting to re-engage customers, and suffer harm to its reputation, customer relationships, and goodwill. *Id.* ¶¶ 68–70.

## III. ARGUMENT

### A. The Complaint Plausibly Alleges Causation.

GoodLeap does not allege a coincidence. It alleges a system, and it describes every step. *First*, SCRC targets GoodLeap borrowers with promises of a "100% FAVORABLE OUTCOME" "[b]acked by licensed attorneys" and extracts upfront fees of $4,500 or more. FAC ¶¶ 27–43. *Second*, SCRC instructs or encourages those borrowers to stop making payments as "part [o]f the process" that "helps them settle faster." *Id.* ¶¶ 44–46. *Third*, SCRC tells borrowers that it "represent[s]" them and directs them to route all communications from their solar lenders through SCRC. *Id.* ¶¶ 47, 63. *Finally*, CALG sends boilerplate letters that further sever communications between borrowers and their lenders and manufacture the impression that

legitimate legal proceedings are underway. *Id.* ¶¶ 6, 48. The complaint then alleges the predictable result: nearly one hundred defaults within weeks of GoodLeap's receipt of CALG's letters, providing specific, individualized examples. *Id.* ¶¶ 64–65. Those allegations plausibly establish causation for GoodLeap's Lanham Act, FDUTPA, and tortious interference claims.

Defendants respond that GoodLeap's customers "independently" stopped paying, that the complaint establishes only "[s]equence" and "not causation," and that *one* borrower defaulted before GoodLeap received a letter sent purportedly on her behalf. Mot. at 7–8, 10–11. Each argument depends on a mischaracterization of the complaint. GoodLeap does not allege that CALG's letters caused the defaults. GoodLeap alleges that Defendants' multistep scheme caused them, and that CALG's letters are one part of that scheme. *See supra* § II. At the pleading stage, the Court must accept those allegations and draw all reasonable inferences in GoodLeap's favor. *See Twombly*, 550 U.S. at 555–56; *Iqbal*, 556 U.S. at 678–79.

Even on Defendants' own telling, borrower predisposition would not break the causal chain. The challenged conduct "need not be the only cause or even the predominant cause" of the injury. *Reed Hein*, 2019 WL 3934468, at *4. And as this Court has held in the analogous timeshare context, whether particular borrowers were predisposed to breach is a fact-intensive question that cannot be resolved on the pleadings. *Miller*, 2019 WL 5394074, at *7; *see*

*also, e.g.*, *Wyndham Vacation Ownership, Inc. v. Clapp Bus. Law, LLC*, 411 F. Supp. 3d 1310, 1317 (M.D. Fla. 2019). If anything, the predisposition argument "seemingly concedes" that Defendants' "'legal representation' consisted of assisting" the breach. *Miller*, 2019 WL 5394074, at *7.

Defendants' claim-specific causation arguments fare no better.

***Lanham Act claims.*** Defendants are wrong that GoodLeap does not satisfy the "zone of interests" test of *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). That test is "not especially demanding." *Id.* at 129–34 (cleaned up). A plaintiff need only "allege an injury to a commercial interest in reputation or sales." *Id.* at 131–32. GoodLeap alleges both. It alleges reputational injury because SCRC's advertising targets GoodLeap by name, including by attributing "'sins' or fraudulent misrepresentations" to "lenders like GoodLeap." FAC ¶ 60. That injury suffices because "[w]hen a defendant harms a plaintiff's reputation by casting aspersions on its business, the plaintiff's injury flows directly from the audience's belief in the disparaging statements." *Lexmark*, 572 U.S. at 138. And it alleges financial harm: nearly one hundred defaulted loans to date, forgone revenue, and increased servicing costs. FAC ¶¶ 64–65, 68.

This Court has sustained materially identical injury allegations. The plaintiffs in *Miller* alleged that the defendant's advertisements caused "consumers to believe that [plaintiffs'] business model is unlawful and that

they were 'scammed' into their timeshares, necessitating Defendants' 'help,'" and that the defendants caused the plaintiffs' clients to stop paying their financial obligations. 2019 WL 5394074, at *4. The Court held those allegations satisfied the zone-of-interests test because they plausibly alleged "*both*" injury to a commercial interest in reputation and in sales. *Id.*; *see also, e.g.*, *Diamond Resorts*, 371 F. Supp. 3d at 1102. So do GoodLeap's.

Defendants argue that GoodLeap cannot satisfy the zone-of-interests requirement because it is a creditor, "not a competitor whose sale was diverted." Mot. at 2. *Lexmark* holds otherwise. Where, as here, "a party claims reputational injury from disparagement, competition is not required for proximate cause." 572 U.S. at 138; *see also Miller*, 2019 WL 5394074, at *4–5 (rejecting argument that parties were merely "adversaries, not competitors").

Defendants' authorities involved advertisements that merely invited consumers to inquire about exit services. SCRC's advertisements promise cancellation as a guaranteed result of purchase. *Compare Wesley Fin. Grp., LLC v. Westgate Resorts, Ltd.*, 746 F. Supp. 3d 1342, 1351–52 (M.D. Fla. 2024) (challenged advertisements only "direct[ed] owners to ask about" a free timeshare exit program), *and Orange Lake Country Club, Inc. v. Reed Hein & Assocs., LLC*, 2019 WL 7423517, at *14 (M.D. Fla. Oct. 4, 2019) (summary judgment record established advertisements were not "intended to induce" nonpayment), *with supra* § II (SCRC advertising "No more Solar Payments!,"

"100%" "guaranteed" results, and instructing consumers to hold GoodLeap "responsible" for "'sins' or fraudulent misrepresentations").

This Court and others have allowed comparable theories to proceed past the pleadings. In *Miller*, this Court denied a motion to dismiss and held that advertisements of "guarantee[d]" outcomes were "assertions of fact upon which reasonable consumers might rely." 2019 WL 5394074, at *5–6; *see also Wyndham Vacation Ownership, Inc. v. US Consumer Att'ys*, 2019 WL 7837887, at *7–8 (S.D. Fla. July 3, 2019). And Defendants' reliance on the initial dismissal in *Reed Hein* (Mot. at 9) omits that the court later declined to dismiss an amended Lanham Act claim that, like this one, advertised a "guaranteed" way of exiting a contract. *Reed Hein*, 2019 WL 3934468, at *1, 4–5.

***FDUTPA and tortious interference claims.*** The allegations that establish causation under the Lanham Act establish it under FDUTPA and Florida tortious interference law as well. For FDUTPA, the complaint alleges that Defendants caused GoodLeap's losses by instructing borrowers to stop paying and by directing borrower communications away from GoodLeap, and that GoodLeap is an "interested party or person" that suffered actual losses as a result. Fla. Stat. § 501.203(6); FAC ¶¶ 44–45, 92–98. For tortious interference, the complaint alleges that Defendants intentionally procured the borrowers' breaches by instructing and encouraging nonpayment, obstructing communications between GoodLeap and its customers, and running

advertising that calls out GoodLeap by name, all in service of Defendants' own financial interests. FAC ¶¶ 103–05. Courts in this District have sustained FDUTPA and tortious interference claims on materially identical allegations, including where the defendants solicited owners with "guaranteed" exit services and then instructed them to stop making payments. *Miller*, 2019 WL 5394074, at *1–2, 6–8. GoodLeap's claims are no different.

**B. The Complaint Plausibly Alleges Lanham Act Violations.**

**1. The Complaint Plausibly Alleges Materiality.**

Defendants argue GoodLeap failed to plead "materiality" because it did not allege that SCRC's advertisements influenced its customers' decisions to obtain GoodLeap loans. Mot. at 12–13. That is not the test. Materiality asks whether the challenged advertisements were "likely to influence" the decision to purchase the product or service *being advertised*. *J-B Weld Co. v. Gorilla Glue Co.*, 978 F.3d 778, 796–97 (11th Cir. 2020). The product SCRC advertised is its own purported solar loan "exit" service, not GoodLeap's loans.

That GoodLeap does not sell the advertised product is irrelevant. *Lexmark* itself permitted a Lanham Act claim by a plaintiff that neither competed with the defendant nor sold the product the challenged advertising promoted. 572 U.S. at 137–40. And in the timeshare exit context, courts have routinely held that allegations about advertising that "deceived timeshare owners into purchasing and enrolling in Defendants' timeshare exit program"

plead materiality under the Lanham Act. *US Consumer Att'ys*, 2019 WL 7837887, at *11; *see also Clapp*, 411 F. Supp. 3d at 1317–18.

Defendants' alternative complaint that GoodLeap's materiality allegations are "conclusory," Mot. at 13, cannot be squared with the pleading. The complaint alleges in detail that SCRC advertised solar loan cancellation services as legitimate, guaranteed, and attorney-backed in order to induce borrowers to enroll, and it reproduces numerous examples of those advertisements. FAC ¶¶ 28, 33, 37–38. It further alleges that the advertisements succeeded in inducing solar loan borrowers, including GoodLeap customers, to pay substantial upfront fees for those services. *Id.* ¶¶ 40–43. Courts routinely hold such allegations sufficient. *See, e.g.*, *US Consumer Att'ys*, 2019 WL 7837887, at *11 (allegation that advertisements "deceived timeshare owners into purchasing and enrolling in Defendants' timeshare exit program" established materiality).

**2. The Complaint Plausibly Alleges a Contributory Claim.**

GoodLeap plausibly alleges CALG knowingly and materially contributed to SCRC's false advertising. A contributory false-advertising claim requires that the defendant "knowingly induc[ed] or caus[ed] the conduct, or . . . materially participat[ed] in it." *Duty Free Ams., Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1277 (11th Cir. 2015). Participation is established if the defendant provided "a necessary product or service, without which the false advertising

would not be possible," or if the defendant intended to participate in, or knew of, the false advertising and actively furthered it. *Id.* at 1277–78.

GoodLeap alleges both. SCRC's advertisements require a participating law firm, and the complaint alleges that CALG filled that role by accepting the resulting clients and sending form letters to lenders designed to create the false impression that legal proceedings were underway. FAC ¶¶ 48–54, 84–89. The complaint likewise supports the reasonable inference that CALG knew of and sanctioned the advertising: SCRC's advertising is public and widespread, so CALG cannot claim ignorance of it; CALG's intake form links to SCRC's terms and privacy policy; the two entities share a physical address and email access; and CALG receives fees and other financial benefits from the SCRC-generated pipeline, which supplies much or all of CALG's solar-cancellation revenue. *Id.* ¶¶ 32, 34–36, 49–54, 86–89. Those ties plausibly show that CALG had visibility into, and permitted, the claims made about its own services.

This Court and others have found materially similar allegations sufficient under *Duty Free*. In *Reed Hein*, the court declined to dismiss a contributory Lanham Act claim where the plaintiff alleged that the lawyers knew of the exit company's widespread advertising, accepted and profited from the resulting clients, and supplied the attorney participation without which the marketer could not have advertised the guaranteed legal "exit." 2019 WL 3934468, at *6–7; *see also, e.g.*, *Miller*, 2019 WL 5394074, at *6.

*Duty Free* itself is not to the contrary. The complaint there alleged no coordination, encouragement, control, monitoring, or participation between the defendants. 797 F.3d at 1278–79. That is a far cry from GoodLeap's allegations about Defendants' linked websites, shared address and email access, client-and-fee pipeline, and CALG's form demand letters purportedly implementing the very process SCRC advertised. FAC ¶¶ 48–54. CALG's knowledge is further supported by the advertising's widespread nature, a factor *Duty Free* identifies as suggestive of "knowing or intentional participation." 797 F.3d at 1278; FAC ¶ 88. Defendants' characterization of all of this as an "ordinary business relationship" asks the Court to adopt their preferred factual inference, which it cannot do at this stage. *See supra* § III.A.

Defendants also argue, in a footnote, that the Lanham Act does not permit contributory claims because *Duty Free* was "incorrectly decided." Mot. at 14 n.6. *Duty Free* is binding Eleventh Circuit precedent, and a footnote is not the place to ask a district court to disregard it. Defendants' remaining arguments against the contributory claim are expressly derivative of their arguments against the direct Lanham Act claim, Mot. at 14, 17, and fail for the same reasons. *See supra* §§ III.A–B.

### C. Rule 9(b) Does Not Apply and Does Not Warrant Dismissal of Any Claim.

Defendants argue that the FDUTPA and civil conspiracy claims "are

based upon fraud" and are therefore subject to Rule 9(b). Mot. at 17–18. Rule 9(b) does not reach the portions of those claims that do not sound in fraud, and both claims are pleaded with particularity in any event.

Rule 9(b) applies to a FDUTPA claim only to the extent the claim "sound[s] in fraud." *Pop v. LuliFama.com LLC*, 145 F.4th 1285, 1293–96 & n.10 (11th Cir. 2025) (cleaned up). Where only part of a claim sounds in fraud, courts apply Rule 9(b) to that part alone. *See Jovine v. Abbott Labs., Inc.*, 795 F. Supp. 2d 1331, 1343–44 (S.D. Fla. 2011). GoodLeap's FDUTPA claim does not rest entirely on SCRC's fraudulent advertisements. It also alleges non-fraudulent misconduct: Defendants' integrated referral and compensation arrangements, nonlawyer control over intake and client management, instructions to stop paying GoodLeap, interference with lender-customer communications, and mass form letters used to manufacture defaults and settlement leverage. FAC ¶¶ 40–54, 92–100. Those practices are actionable because they are alleged to be unethical, oppressive, unscrupulous, and substantially injurious, whatever their fraudulent character. *See PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003). The conspiracy claim likewise alleges agreements that do not sound in fraud, including an agreement to tortiously interfere with GoodLeap's contracts. FAC ¶¶ 109–15.

Even if Rule 9(b) applied in full, GoodLeap satisfies it. Rule 9(b) requires the "who, what, when, where, and how" of the challenged conduct, *Pop*, 145

F.4th at 1295–96, while permitting knowledge and intent to be alleged generally, because "a plaintiff rarely will be able to plead a defendant's actual state of mind, particularly before it has access to discovery," *Otto Candies, LLC v. Citigroup Inc.*, 137 F.4th 1158, 1178–80, 1185 (11th Cir. 2025). The rule's purpose is to "adequately alert[] . . . [defendants] to the precise misconduct with which they are charged." *Miller*, 2019 WL 5394074, at *2. GoodLeap's complaint does exactly that. It pleads each Defendant's role separately, explaining that SCRC operated as the marketing and sales arm of the operation and that CALG supplied the law-firm veneer that made SCRC's pitch credible. FAC ¶¶ 26–54, 84–89, 92–100. It reproduces and dates the precise misrepresentations, identifies where they appeared, and explains how and why they were misleading. *Id.* ¶¶ 27–39, 49–50. And it pleads what Defendants gained, such as upfront fees, and how GoodLeap was injured, including reputational harm. *Id.* ¶¶ 40–43, 54, 64–71, 73, 79, 86–89, 98–100, 113–15; *see also Reed Hein*, 2019 WL 3934468, at *7–8; *infra* § III.E (allegations about communications to which GoodLeap was not privy are not required).

The pleadings in Defendants' cases bear no resemblance to this one. In *Pop*, the plaintiff failed to identify the specific post, when it was made, which product was purchased, how the post caused the purchase, or which defendant made which representation. 145 F.4th at 1295–96. In *Eagletech Communications, Inc. v. Bryn Mawr Investment Group, Inc.*, the complaint

alleged only that the defendants had "combined, agreed, and conspired," without explaining the scheme or any defendant's role. 79 So. 3d 855, 863 (Fla. 4th DCA 2012). GoodLeap's complaint has none of those defects.

### D. The Complaint Plausibly Alleges Recoverable Damages and Future Harm Under FDUTPA.

Defendants argue that lost profits, competitive harm, and reputational and goodwill injuries are unrecoverable "consequential damages" under FDUTPA, and that GoodLeap lacks standing to seek injunctive or declaratory relief absent a "real and immediate" threat of future harm. Mot. at 19–22. Both arguments are wrong.

First, lost profits already suffered are recoverable. As Defendants acknowledge, *Diamond Resorts* held that "lost profits already suffered constitute 'actual damages' for purposes of FDUTPA." 371 F. Supp. 3d at 1115. Defendants ask the Court to "decline to follow" that decision, Mot. at 21, but it states the settled rule in this Circuit. *See, e.g.*, *Adacel, Inc. v. Adsync Techs., Inc.*, 2020 WL 8641582, at *2 (M.D. Fla. May 18, 2020) (rejecting the argument that lost profits are unrecoverable under FDUTPA and observing that "courts in this Circuit have held that a business can recover lost profits it has already incurred" as actual damages); *JAWHBS, LLC v. Arevalo*, 2017 WL 1345141, at *8 (S.D. Fla. Apr. 12, 2017); *ADT LLC v. Alarm Prot. Tech. Fla., LLC*, 2013 WL 11276119, at *5 (S.D. Fla. Apr. 18, 2013); *Sun Prot. Factory, Inc. v. Tender*

*Corp.*, 2005 WL 2484710, at *13–14 (M.D. Fla. Oct. 7, 2005).

Defendants' reliance on *Ounjian v. Globoforce, Inc.*, 89 F.4th 852 (11th Cir. 2023), for the proposition that GoodLeap may recover only "the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties," Mot. at 20, proves nothing. That measure "is meaningless" where, as here, the plaintiff is harmed not because it "purchased a worthless product" but because it "lost business and profits." *ADT*, 2013 WL 11276119, at *5. In those circumstances, courts permit FDUTPA claims for lost sales and profits to proceed. *See Sun Prot. Factory*, 2005 WL 2484710, at *13–14. GoodLeap alleges precisely such losses, including that Defendants' scheme has caused nearly one hundred customers to breach their loan agreements and stop paying. FAC ¶¶ 64–65, 68, 98. Those damages are recoverable under *Diamond Resorts*, which, in Defendants' own words, "permitted a plaintiff to pursue unpaid promissory-note and fee amounts as 'lost profits already suffered.'" Mot. at 20.

Defendants are equally wrong that GoodLeap cannot recover for competitive, reputational, and goodwill injuries. FAC ¶¶ 69–70. GoodLeap is not a customer of Defendants' advertised product, and courts regularly permit such plaintiffs to pursue those injuries. In *Delta Air Lines, Inc. v. Network Consulting Associates, Inc.*, 2014 WL 4347839 (M.D. Fla. Sept. 2, 2014), the

plaintiff alleged that the defendant's unauthorized use of its trademark caused "damages to [its] goodwill." *Id.* at *9. The court held those goodwill injuries stated a claim for recoverable FDUTPA damages precisely because the plaintiff was not "a purchaser of a product [] deceived about the product by the seller," so the market-value measure did not apply. *Id.*; *see also, e.g.*, *Tracfone Wireless, Inc. v. Access Telecom, Inc.*, 642 F. Supp. 2d 1354, 1365 (S.D. Fla. 2009) (permitting FDUTPA claim where misconduct "undermined" business' reputation and "led to lost profits"); *Popeyes La. Kitchen, Inc. v. Fla. Pop, LLC*, 723 F. Supp. 3d 1196, 1207–08 (S.D. Fla. 2024) ("a business's diminished value can constitute actual damages"). The same is true here.

Second, FDUTPA expressly authorizes injunctive and declaratory relief. Fla. Stat. § 501.211(1). It does not require a showing of "a serious risk of continuing irreparable injury" or "the absence of an adequate remedy at law." *Galstaldi v. Sunvest Cmtys. USA, LLC*, 637 F. Supp. 2d 1045, 1057 (S.D. Fla. 2009). GoodLeap need only plead facts "giving rise to an inference that [it] will suffer *future* [harm] by the defendant[s]." *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1328–29, 1334–35 (11th Cir. 2013).

The complaint clears that bar. GoodLeap alleges that SCRC "has *and continues* to target individuals in this District using its false and misleading advertisements," and that Defendants' roster of GoodLeap customers "has rapidly grown over just the past few months." FAC ¶¶ 10, 21, 62 (emphasis

added). GoodLeap also alleges its "losses will continue to escalate" absent an injunction because the harm is "ongoing," with SCRC's website still live and deceiving Florida consumers. *Id.* ¶¶ 69, 71–72, 94, 99. And GoodLeap alleges CALG's CEO agreed to stop this scheme before, only to redeploy it against GoodLeap. *Id.* ¶¶ 55–59. Those are not "conclusory assertions" resting on a "speculative chain." Mot. at 22. They support the reasonable inference that an operating enterprise will keep doing the thing it was built to do, an inference the Court must credit at this stage. *See supra* § III.A.

Courts regularly enjoin this precise kind of debt cancellation scheme. In *FTC v. Life Management Services of Orange County, LLC*, 350 F. Supp. 3d 1246 (M.D. Fla. 2018), the court enjoined a "debt-elimination" scheme premised on "customers ceasing to make payments on their credit card debt" given "a reasonable likelihood that [defendant] will engage in future violations." *Id.* at 1255, 1273. In *Wyndham Vacation Ownership, Inc. v. CLS, Inc.*, 2024 WL 553483 (M.D. Fla. Feb. 12, 2024), the court enjoined a marketing firm from contacting the plaintiff's owners or otherwise interfering with its contractual relationships. *Id.* at *1. And in *Wyndham Vacation Ownership, Inc. v. Slattery, Sobel & Decamp, LLP*, 2023 WL 12258427 (M.D. Fla. Aug. 7, 2023), the court enjoined an exit scheme built on form cease-and-desist letters and instructions to stop paying. *Id.* at *1–3, *8. Defendants' lone contrary authority, *Kurimski v. Shell Oil Co.*, 570 F. Supp. 3d 1228 (S.D. Fla. 2021), is

inapposite: the plaintiff there pleaded no injury in fact and no continuing conduct, and "d[id] not actually request any . . . equitable relief." *Id.* at 1240, 1251. The FDUTPA claim should not be dismissed.

**E. The Complaint Plausibly Alleges Tortious Interference.**

GoodLeap pleads each element of tortious interference with a contractual relationship: (1) a contract; (2) the defendant's knowledge of the contract; (3) the defendant's intentional and unjustified procurement of a breach; and (4) resulting damages. *US Consumer Att'ys*, 2019 WL 7837887, at *5. The complaint alleges that GoodLeap's customers enter into valid, enforceable Loan Agreements, FAC ¶¶ 24, 102; that SCRC's business model of targeting solar loan borrowers and reviewing their actual loan terms during purported "case reviews" gave Defendants actual and constructive knowledge of those agreements, *id.* ¶¶ 40, 103, 118; that Defendants' instructions and encouragement to stop paying and to route all lender communications to SCRC constituted intentional and unjustified procurement of breach, *id.* ¶¶ 44–48, 103; and that GoodLeap suffered resulting damages, including lost payments and harm to customer relationships and goodwill, *id.* ¶¶ 105–08.

Defendants' sole authority, *ECB USA, Inc. v. Savencia Cheese USA, LLC*, 148 F.4th 1332 (11th Cir. 2025), involved a plaintiff that alleged only that the defendant "had knowledge" and "procured [a] breach" without saying "when, how, or why." *Id.* at 1348–49. By contrast, GoodLeap's complaint

details a documented, multi-month scheme aimed at GoodLeap and corroborated by Better Business Bureau complaints and a former SCRC trainee's public account of how the company operates. FAC ¶¶ 1, 27–36, 39–48, 60–61. Defendants' demand that GoodLeap identify the "specific customer's loan agreement[s]" they reviewed and their specific communications with "particular customer[s]," Mot. at 22–23, asks for details within Defendants' exclusive knowledge that even Rule 9(b) does not require. *See US Consumer Att'ys*, 2019 WL 7837887, at *4–5. In *Bluegreen Vacations Unlimited, Inc. v. Timeshare Lawyers, P.A.*, 2021 WL 3733117 (S.D. Fla. Aug. 23, 2021), for example, the court rejected the argument that a complaint was "overly vague" because it "d[idn't] identify the specific timeshare owners they purportedly help induce or what timeshare contracts were breached because of the scheme," holding those specifics "unnecessary" at the pleading stage. *Id.* at *4. The same is true here.

**F. The Complaint Plausibly Alleges Unauthorized Practice of Law.**

Defendants argue that the unauthorized practice of law ("UPL") claim fails because (1) GoodLeap did not allege that the Florida Supreme Court has found the alleged misconduct to be UPL, and (2) GoodLeap was not SCRC's client. Neither argument withstands scrutiny.

First, the Florida Supreme Court has addressed this exact model. *Florida Bar v. TIKD Services LLC*, 326 So. 3d 1073 (Fla. 2021), holds that a

nonlawyer entity engages in the unauthorized practice of law when it advertises and sells attorney-backed legal services, screens and collects fees from consumers, and controls the client relationship, even where licensed attorneys ultimately perform some of the underlying work. *Id.* at 1078–82. That is the conduct alleged here. SCRC advertises "full legal support from licensed attorneys," "attorney-led contract review," and "100%" "guaranteed" outcomes, FAC ¶¶ 27–30; conducts a purported "case review" of the customer's loan agreement and charges fees of $4,500 or more, *id.* ¶¶ 40–43, 119; remains the customer's primary point of contact and directs the customer to route all lender communications through SCRC, *id.* ¶¶ 47, 120; and earns a volume-based fee that CALG's nominal law-firm status merely dresses up, with SCRC's own employees "manag[ing] the cases," *id.* ¶¶ 6, 43. If the Court concludes that *TIKD* must be identified in the pleading itself, GoodLeap should be granted leave to amend. *See* Fed. R. Civ. P. 15(a)(2).

Second, neither of Defendants' cases strips GoodLeap of standing. Mot. at 24–25. *Goldberg v. Merrill Lynch Credit Corp.* held that "victims may bring private actions to recover fees and damages based on unlicensed practice." 35 So. 3d 905, 907 (Fla. 2010). It did not hold that *only* the *recipients* of unauthorized legal services qualify as victims. And *Sigma Financial Corp. v. Investment Loss Recovery Services, Inc.*, 673 So. 2d 572 (Fla. 4th DCA 1996), decided fourteen years before *Goldberg*, merely reflected the then-existing rule

that the Florida Bar had "exclusive[]" authority to prosecute UPL claims. *Id.* at 573. The UPL claim should not be dismissed.

### G. The Complaint Plausibly Alleges Conspiracy and Declaratory Judgment Claims.

Defendants argue that the conspiracy and declaratory judgment claims fail for want of an "underlying actionable wrong" or "cause of action." Mot. at 23, 25. The premise is wrong. The complaint states claims for tortious interference and for violations of FDUTPA and the Lanham Act, *see supra* §§ III.A–E, so the conspiracy and declaratory judgment claims survive with them. *See Miller*, 2019 WL 5394074, at *7 (declining to dismiss conspiracy claim because the underlying tort was "properly stated").

Defendants' alternative argument that the declaratory judgment claim is duplicative fares no better. Mot. at 25. Rule 57 expressly provides that the existence of another adequate remedy does not preclude declaratory relief. And as Defendants concede, duplicativeness is a discretionary case-management determination, better made once the factual record has been developed. GoodLeap's request for a speedy hearing under Rule 57, FAC ¶ 131, confirms that it seeks an expedited determination of the legality of Defendants' ongoing scheme independent of the timing and scope of any other relief.

### H. Venue Is Proper Here, and the Relevant Factors Disfavor Transfer.

Defendants' alternative request to transfer refutes itself. Defendants

cannot agree on whether Arizona or Nevada is more convenient, and either forum would require at least one Defendant and its witnesses to travel. Mot. at 27, 31; *id.*, Ex. A ¶ 10; *id.*, Ex. B ¶ 10. That is not the showing Section 1404(a) requires, and the burden is Defendants' alone. *See Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 260 (11th Cir. 1996). Venue is proper in this District, and the relevant factors overwhelmingly disfavor transfer.

**1. Venue Is Proper in This District.**

In a false advertising case, a substantial part of the events occurs where the deception reaches consumers, which "provides an obviously correct venue." *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1371–72 (11th Cir. 2003). Courts accordingly "look to whether a defendant has targeted the judicial district with advertisements and whether products were marketed and sold in that district." *Waste Pro USA, Inc. v. Adams Sanitation Holding Co., LLC*, 2022 WL 19842681, at *3 (M.D. Fla. July 18, 2022). Venue lies in any "judicial district in which a substantial part of the events or omissions giving rise to the claim occurred," and a plaintiff is "not required to select the venue with 'the *most* substantial nexus to the dispute.'" *Nationwide Relocation Servs., Inc. v. Walker*, 2008 WL 11333712, at *3 (S.D. Fla. Feb. 29, 2008) (emphasis added).

Defendants aimed their deception at this District. SCRC markets directly to Florida borrowers, including via a website devoted to "Florida Solar Contract Cancellation" and a Facebook page for "Florida homeowners," and by

advertising that it "serves homeowners throughout Florida," including every county in this District. FAC ¶ 39. SCRC "has and continues to target individuals in this District," and Defendants' customers include at least 17 GoodLeap borrowers in this Division alone. *Id.* ¶ 21. CALG sent form letters purportedly on behalf of Florida consumers, several of whom defaulted on their GoodLeap loans within days. *Id.* ¶¶ 12, 64–65. And the resulting harm lands on a loan portfolio that is nearly 20% Florida residents. *Id.* ¶ 23. That targeting is the "passing off" of Defendants' deceptive practices, and it makes this District "an obviously correct venue." *Jenkins Brick*, 321 F.3d at 1371.

Courts in this District have found venue proper on materially identical allegations. This Court declined to transfer where the defendant's "marketing activities were directed into the Middle District of Florida." *Wyndham Vacation Ownership, Inc. v. Salkin*, 2023 WL 4350566, at *3 (M.D. Fla. Apr. 25, 2023), *report and recommendation adopted*, 2023 WL 4350441 (May 15, 2023) (Byron, J.). Other courts agree, declining to transfer where defendants induced consumers to "stop making payments under their contracts" and published "false or misleading advertisements widely accessible to consumers in Orlando," noting the absence of contradicting affidavits. *Wyndham Vacation Ownership, Inc. v. Square One Dev. Grp., Inc.*, 2020 WL 4757333, at *3 (M.D. Fla. Apr. 13, 2020); *see also Wyndham Vacation Ownership, Inc. v. Slattery, Sobel & DeCamp, LLP*, 2021 WL 4948102, at *6 (M.D. Fla. July 6, 2021).

Defendants' declarations confirm venue is proper. Fonbuena admits CALG "employs two Florida attorneys" with "relevant" knowledge. Mot., Ex. A ¶¶ 4, 7. Neither declaration disputes the alleged Florida-specific targeting, so the Court must accept those allegations as true. *Home Ins. Co. v. Thomas Indus., Inc.*, 896 F.2d 1352, 1355 (11th Cir. 1990). The declarations say only that SCRC's advertising was "created, reviewed, approved, and disseminated" from Arizona and that CALG mailed its letters from Nevada. Mot., Ex. B ¶ 5; *id.*, Ex. A ¶ 6. But venue lies "not where the deceptive labels are affixed to the goods . . . but where the passing off occurs." *M Tobacos, Inc. v. Case*, 2015 WL 11438107, at *2 (S.D. Fla. Apr. 17, 2015) (citation omitted).

**2. The Relevant Factors Overwhelmingly Disfavor Transfer.**

Defendants must establish that Arizona and Nevada are "more convenient." *In re Ricoh Corp.*, 870 F.2d 570, 573 (11th Cir. 1989). GoodLeap's "choice of forum should not be disturbed unless it is *clearly outweighed* by other considerations." *Robinson*, 74 F.3d at 260 (emphasis added). Defendants assert that "nearly every factor favors transfer," Mot. at 28, but they reach that conclusion only by omitting three of the nine factors and disregarding the record on the rest. Taken one at a time, the factors disfavor transfer.

**Choice of Forum.** A plaintiff's chosen forum may "favor[] retention" even when the plaintiff is a non-resident. *Steadfast Ins. Co. v. IGD Hosp., Inc.*, 2019 WL 13227253, at *7 (M.D. Fla. Jan. 29, 2019). That is especially so where,

as here, the chosen forum is among the "loci of operative facts." *Arnold v. Target Contractors LLC*, 2025 WL 1203104, at *4 (M.D. Fla. Feb. 27, 2025); *see supra* § III.H.1. This factor disfavors transfer.

**Convenience of Witnesses.** Defendants must make "a specific showing of inconvenience," including by "identifying those necessary witnesses and indicating what their testimony at trial will be." *Nat'l Trust Ins. Co. v. Pa. Nat'l Mut. Cas. Ins. Co.*, 223 F. Supp. 3d 1236, 1242–43 (M.D. Fla. 2016). The factor's "significance is diminished" where, as here, the "witnesses, although in another district, are employees of a party and their presence at trial can be obtained by that party." *Trinity Christian Ctr. of Santa Ana, Inc. v. New Frontier Media, Inc.*, 761 F. Supp. 2d 1322, 1327 (M.D. Fla. 2010). Defendants concede that two CALG witnesses are Florida-based and identify only four out-of-state witnesses, every one of them their own employee. Mot. at 29; *id.*, Ex. A ¶¶ 2, 7; *id.*, Ex. B ¶¶ 2, 6. GoodLeap, by contrast, has alleged that "at least 17 GoodLeap customers residing in the Orlando division have been implicated by Defendants' scheme." FAC ¶¶ 12, 21, 64–65. This factor disfavors transfer.

**Compulsory Process.** This factor is "a non-issue" where, as here, Defendants have not "identified any witnesses that are potentially unwilling to participate at trial." *Legg v. Quicken Loans, Inc.*, 2015 WL 13753742, at *3 (S.D. Fla. Mar. 6, 2015). This factor does not support transfer.

**Sources of Proof.** "[T]he location of relevant documents and other

tangible sources is no longer a heavily weighted factor," because "technological advances now permit the electronic transmittal of documents." *Nat'l Trust*, 223 F. Supp. 3d at 1243–44. CALG admits as much. Mot., Ex. A ¶ 4. This factor does not support transfer.

**Locus of Operative Facts.** Nationwide advertising "does not establish a locus of facts in any particular forum." *Trinity*, 761 F. Supp. 2d at 1329. Nor do out-of-state marketing decisions, where the "website can be accessed nationwide." *Thursday LLC v. Klhip Inc.*, 2018 WL 4574877, at *5 (M.D. Fla. July 11, 2018). To the extent these claims have a center of gravity, it is Florida. Defendants aimed their advertising here. *See supra* § III.H.1. And nearly 20% of GoodLeap's current customers live here—substantially more than the approximately 12% of GoodLeap customers in Arizona and 7.5% in Nevada. *See* Declaration of Matt Dawson ¶¶ 3–4. This factor disfavors transfer.

**Convenience of the Parties.** This factor carries "minor" weight. *Amar Shakti Enters., LLC v. Wyndham Worldwide, Inc.*, 2011 WL 13298587, at *3 (M.D. Fla. June 2, 2011). Where transfer "would merely shift the inconvenience from the defendant to the plaintiff, the plaintiff's choice of forum should not be disturbed." *Trinity*, 761 F. Supp. 2d at 1328–29. Defendants chose to target and purportedly represent clients in Florida, including in this District, *see supra* § III.H.1, and cannot now complain that litigating here is inconvenient. Nor can they identify where they would rather be: SCRC prefers

Arizona and CALG prefers Nevada, Mot. at 27, 31, so on either proposal, at least one Defendant and its witnesses must travel. *See Trinity*, 761 F. Supp. 2d at 1328 (airplane travel required regardless of forum, and defendant offered no "evidence that the longer airplane flight to Florida is a significantly greater inconvenience"). Both sides' lead counsel are Florida-based. *See id.* (considering "appearance of counsel" in court). This factor disfavors transfer.

**Interests of Justice.** Florida's interest in this case is substantial: Defendants targeted Florida consumers, including dozens of GoodLeap customers, who then breached their contracts in Florida. FAC ¶¶ 12, 21, 62, 64–65 & n.1. Florida has "a very strong interest" in remedying "intentional misconduct of nonresidents causing injury in Florida." *Licciardello v. Lovelady*, 544 F.3d 1280, 1288 (11th Cir. 2008). This factor disfavors transfer.

**Familiarity with Governing Law.** Florida-law claims predominate, and a Florida judge "is most adept at applying Florida law." *Thursday*, 2018 WL 4574877, at *4. This factor disfavors transfer.

## IV. CONCLUSION

Defendants ask the Court to disbelieve a detailed complaint at the pleading stage and then to move the case to a district they themselves cannot agree on. The motion should be denied in full. To the extent the Court dismisses any claim, GoodLeap respectfully requests leave to amend. *See* Fed. R. Civ. P. 15(a)(2) (courts "should freely give leave when justice so requires").

Dated: August 13, 2026

Respectfully submitted,

By: <u>*/s/ Michael J. Holecek*</u>

Michael J. Holecek
Florida Bar No.: 1035950
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
MHolecek@gibsondunn.com
Tel: +1 213.229.7000

Orin S. Snyder
New York Bar No.: 2116424 (*pro hac vice)*
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
OSnyder@gibsondunn.com
Tel: +1 212.351.4000

Debra Wong Yang
California Bar No.: 123289 (*pro hac vice)*
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
DWongYang@gibsondunn.com
Tel: +1 213.229.7000

Jillian N. London
California Bar No.: 319924 (*pro hac vice)*
GIBSON, DUNN & CRUTCHER LLP
2000 Avenue of the Stars, Suite 1200N
Los Angeles, CA 90067-4700
JLondon@gibsondunn.com
Tel: +1 310.552.8500

*Attorneys for Plaintiff GoodLeap, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on August 13, 2026, I caused the foregoing to be electronically filed with the Clerk of the Court by using the CM/ECF system.

*/s/ Jake L. Bubman*
Jake L. Bubman