**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
Orlando Division

GOODLEAP, LLC, a California limited liability company,

Plaintiff,

v.

SOLAR CANCELLATION RESOURCE CENTER LLC, a Wyoming limited liability company; and FONBUENA LAW FIRM, CHTD. d/b/a CONSUMER ADVOCACY LAW GROUP, a Nevada law firm,

Defendants.

Case No. 6:26-cv-01072-PGB-NWH

**SECOND AMENDED COMPLAINT, REQUEST FOR DECLARATORY JUDGMENT, AND DEMAND FOR JURY TRIAL**

## SECOND AMENDED COMPLAINT

Plaintiff GoodLeap, LLC ("GoodLeap"), by and through its attorneys, for its Second Amended Complaint against Solar Cancellation Resource Center LLC ("SCRC") and Fonbuena Law Firm, Chtd. d/b/a Consumer Advocacy Law Group ("CALG") (collectively, "Defendants"), alleges as follows:

## I. INTRODUCTION

1. This case concerns an unlawful and predatory scheme to target thousands of GoodLeap customers. SCRC and CALG use this scheme to induce customers to breach their contracts with GoodLeap by selling them the false

promise of a legal "exit" from loans they took out to purchase solar-energy systems. In exchange for a "100%" "guaranteed" way out of their loan agreements, Defendants lure in GoodLeap customers, collect thousands of dollars in upfront fees, and instruct or encourage them to stop making loan payments and cease communicating with GoodLeap, all without any intent to provide meaningful legal services. Defendants then exploit the resulting delinquencies and the threat of massive arbitration fees to extract settlements from GoodLeap. The customers who pay Defendants end up demonstrably worse off than when they started, with damaged credit, accelerated loan obligations, and no lawyer to show for it.

2. Defendant CALG's managing partner, Richard Fonbuena, has run this playbook before and has twice agreed to permanent injunctions that would shut down this scheme. Before he deployed his scheme on solar customers, Fonbuena deployed it on timeshare owners through entities including Fonbuena Law and Timeshare Defense Attorneys. The script was identical: a nonlawyer marketing arm generated leads with promises of a "legal exit"; a law-firm label supplied legitimacy; consumers were told to stop paying their financial obligations under their contracts; large upfront fees were collected; boilerplate demand letters were dispatched; and little or no real legal work was performed. One of those cases, *Wyndham Vacation Resorts, Inc. v. Timeshare Exit Hotline*, was litigated in this District and ended after Fonbuena and his

firm agreed to stop their timeshare exit scheme. A second, *Capital Resorts Group, LLC v. Fonbuena Law Firm, CHTD*, ended the same way in the District of South Carolina. Having twice promised that he would stop, Fonbuena did not reform. He instead pointed the same scheme at a new industry and a new target—GoodLeap and its customers.

3. Defendant SCRC is the marketing and sales arm of this scheme. It is not a law firm. Its employees are not lawyers. Yet it blankets the internet and social media—including channels specifically targeting Florida homeowners—with advertising designed to look like the work of a serious legal practice. SCRC promises "full legal support from licensed attorneys," "attorney-led contract review," "legal review by real attorneys," and "100% legal support." It tells homeowners it is "certified in contract law" and can help them "break free—legally and permanently" from their solar contracts.

4. SCRC also backs its sales pitch with deceptive guarantees that violate the rules of professional conduct: that it "only accepts cases where [it] know[s] the outcome will be favorable," offers a "100% satisfaction guarantee," and delivers "100% favorable outcome[s]."

5. One example of SCRC's false advertising and unlicensed legal practice is below:




6. To perpetuate its scheme, SCRC conspires and collaborates with Defendant CALG. CALG lends SCRC's sales pitch the appearance of genuine legal representation. But in reality, all client communications are filtered through SCRC, and it is SCRC's employees who manage the cases, despite not being licensed to practice law. CALG simply sends boilerplate demand letters to solar lenders that are designed not to achieve legal results for customers but are instead intended to cut off communications between lenders and their customers and create the false impression that legitimate legal proceedings are underway regarding those customers' loans. Indeed, some of SCRC's customers have realized that they have been scammed and have complained that they were never put in contact with a lawyer. Meanwhile, CALG and its

attorneys profit from the results of SCRC's false and misleading advertisements, in violation of their ethical obligations.

7. GoodLeap is one of the largest residential solar lenders in the United States. It provides financing for solar energy systems, battery storage, and other sustainable home improvements. Florida customers make up nearly 20% of GoodLeap's solar loan portfolio, and GoodLeap's ongoing direct relationship with each of those customers—its ability to answer questions, address concerns, and work through solutions—is central to both its business and its reputation.

8. GoodLeap's relationships with its customers are governed by clearly written, binding contracts that set forth customers' payment obligations and the parties' rights.

9. Defendants' entire enterprise depends on persuading those customers to break their binding, legal agreements with GoodLeap. Without induced default, there is nothing for Defendants to sell, nothing to "settle," and no leverage to extract. Defendants' product is breach of contract manufactured at scale, monetized twice: once at the front end through upfront fees paid by the customer, and again at the back end through settlement pressure on the lender.

10. Defendants' scheme has expanded at extraordinary speed. Based on what CALG has told GoodLeap, the number of GoodLeap customers that

CALG has purportedly retained as clients has dramatically increased over just the past few months. That is not the trajectory of a law practice taking on cases on the merits. It is the trajectory of an industrial lead-generation operation that profits from volume, not outcomes.

11. Defendants' scheme has already harmed both GoodLeap and its customers. Many GoodLeap customers solicited through this enterprise have stopped paying their loans and stated that they are "unwilling to speak with" GoodLeap representatives because they were told or led to believe that SCRC was handling the matter legally.

12. The pattern is unmistakable at the GoodLeap customer level. One Florida customer had paid GoodLeap on time for three and a half years; she stopped paying eight days after CALG sent a cease-and-desist letter purportedly on her behalf. Another had paid on time for more than four years; she stopped paying eleven days before CALG sent a letter on hers. Nearly one hundred GoodLeap customers have defaulted within days of a CALG letter. These are not coincidences. They are by Defendants' design.

13. GoodLeap brings this action to stop Defendants' false advertising, unlawful legal-services marketing, unauthorized practice of law, and intentional interference with GoodLeap's customer relationships. GoodLeap asserts claims for false advertising under the Lanham Act, contributory false advertising under the Lanham Act, violation of Florida's Deceptive and Unfair

Trade Practices Act ("FDUTPA"), tortious interference with contract, civil conspiracy, and the unauthorized practice of law under Florida law. It seeks injunctive relief, declaratory relief, disgorgement of profits, actual damages, punitive damages, attorneys' fees, and all other appropriate relief.

## II. PARTIES

14. Plaintiff GoodLeap is a California limited liability company with its principal place of business located at 8781 Sierra College Boulevard, Roseville, California 95661.

15. Defendant SCRC is a Wyoming limited liability company, with its principal address at 9160 E. Bahia Dr., Suite 100, Scottsdale, AZ 85260. SCRC is also registered as a foreign limited liability company in Nevada with the address 3320 N. Buffalo Dr., Suite 208A, Las Vegas, Nevada 89129. SCRC is not a law firm. It is a marketing, sales, and referral company that targets consumers in Florida and across the United States through online and other advertising for purported solar contract and solar loan cancellation services.

16. Defendant CALG is a law firm which, like SCRC, purports to have an office at 3320 N. Buffalo Dr., Suite 208, Las Vegas, Nevada 89129. CALG is owned by Fonbuena Law Firm, Chtd., a Nevada limited liability company, and Richard Fonbuena, a Nevada resident. CALG has clients that reside in this district and other districts within the state of Florida and have loans with GoodLeap, and CALG purports to provide legal services to those clients in the

state of Florida. CALG and its attorneys involved in Defendants' scheme against GoodLeap are not licensed to practice law in Florida.

## III. JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction over the claims arising under the Lanham Act pursuant to 28 U.S.C. §§ 1331 and 1338. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367, as those claims are so related to the Lanham Act claims that they form part of the same case or controversy.

18. This Court has personal jurisdiction over Defendants pursuant to Fla. Stat. § 48.193(1)(a)(2), because Defendants "submit[ted themselves] . . . to the jurisdiction of the courts of this state for any cause of action arising from [Defendants] . . . [c]ommitting a tortious act within this state." Defendants are also subject to this Court's jurisdiction as they are operating, conducting, engaging in, or carrying on a business or business venture in this state. To the extent the alleged injury to persons in this state arises out of an act or omission by Defendants outside of this state, this Court has jurisdiction over Defendants because they engaged in solicitation or service activities within Florida.

19. GoodLeap's claims arise out of Defendants' contacts with and purposeful availment of Florida—including but not limited to SCRC's misleading advertising on its website and social media. For example, SCRC's false and misleading advertisements were knowingly directed at residents of

Florida, accessed by residents of Florida, pertained to GoodLeap's business relationships with Florida customers, harmed consumers in Florida, and harmed GoodLeap's business relationships with Florida customers. SCRC maintains Florida-specific advertising, including a Facebook page titled "Solar Cancellation Resource Center Florida," and references to "Florida Solar Contract Cancellation" and Florida law on SCRC's website. Those false and misleading advertisements have worked, because Defendants' "clients" include GoodLeap Florida customers. To the extent Defendants have communicated with those customers in connection with their unlawful scheme, they did so by directing their communications directly into this state for the purpose of profiting from their unlawful scheme. Further, to the extent those customers signed any agreements with Defendants in connection with that scheme, those agreements were presumably executed in Florida. Finally, CALG, working with SCRC, has sent demand letters to GoodLeap, purportedly on behalf of Florida customers.

20. This Court also has personal jurisdiction over Defendants pursuant to Fla. Stat. § 48.193(2) because, as described herein, Defendants are "engaged in substantial and not isolated activity within [Florida]," and GoodLeap's claims arise out of that substantial, not isolated, activity.

21. Venue in the Middle District of Florida is appropriate under 28 U.S.C. § 1391(b) because it is the district in which a substantial part of the

actions giving rise to the claims occurred. For example, Defendants' "clients" include multiple GoodLeap Florida customers that reside in this District, and SCRC has and continues to target individuals in this District using its false and misleading advertisements. Venue in the Orlando Division is appropriate because at least 17 GoodLeap customers residing in the Orlando division have been implicated by Defendants' scheme.

## IV. FACTUAL ALLEGATIONS

### A. GoodLeap Is an Industry-Leading Residential Solar Lender.

22. GoodLeap is a technology company that provides residential consumer financing solutions for energy-efficient home upgrades. Its mission is to make sustainable home improvements affordable, accessible, and easy to understand. Consistent therewith, GoodLeap provides a variety of industry-leading financing options for homeowners to improve their homes with sustainability solutions such as residential solar panels, batteries, energy-efficient HVAC, heat pumps, roofing, and windows.

23. With respect to solar energy, GoodLeap is one of the largest residential solar lenders in the United States by loan volume and has facilitated financing to homeowners nationwide. Currently, Florida residents make up roughly 20% of GoodLeap's solar loan portfolio. GoodLeap's ongoing relationship with its customers is critical to GoodLeap's business and reputation.

24. Every homeowner who finances a solar installation or sustainable home improvement through GoodLeap enters into a binding, written loan agreement with GoodLeap (the "Loan Agreement"). The Loan Agreement governs the customer's payment obligations and all other material terms of the customer's financing relationship with GoodLeap. The Loan Agreements constitute valid, enforceable contracts between GoodLeap and each of its customers.

25. GoodLeap services those Loan Agreements by communicating with customers about payments, account status, disputes, hardship options, and solar-project issues. Direct customer communication is critical to GoodLeap's ability to mitigate delinquencies and help customers, and Defendants' scheme is specifically designed to sever that communication channel.

**B. Defendants' Scheme.**

26. SCRC is not a law firm. SCRC does not employ licensed attorneys who provide legal advice to SCRC customers, does not maintain lawyer trust accounts, and is not subject to law-firm supervision or rules of professional conduct.

27. Despite this, SCRC markets itself to homeowners as offering a legitimate, failsafe legal escape hatch from solar contracts and loans. It calls itself "America's leading experts in helping homeowners exit solar contracts," and it offers "full legal support from licensed attorneys," "attorney-led contract

review," and "free legal" or "case" reviews for solar cancellation. SCRC also promises borrowers success by, for example, advertising that it "only accepts cases where [it] know[s] the outcome will be favorable," has a "100% satisfaction guarantee," and provides "100% favorable outcome[s]."

28. These advertisements are directed at consumers across the United States, including specifically at consumers in Florida, and are designed to induce solar loan borrowers to purchase SCRC's services on the belief that they are obtaining legitimate legal representation with guaranteed, favorable results.

29. Examples of those advertisements are provided below:

a. The home page of SCRC's website advertises "[f]ull legal support from licensed attorneys" that can "help you break free–legally and permanently":



b. SCRC holds itself out as "[b]acked by licensed attorneys and certified in contract law," and it guarantees a "100% FAVORABLE OUTCOME":




c. SCRC markets "[a]ttorney-[l]ed [c]ontract [r]eview":



d. SCRC claims to offer "[l]egal review by real attorneys" with a "100% satisfaction guarantee":




e. SCRC purports to have a "legal team" that can "cancel" a loan "legally":






f. SCRC advertises "100%" "[r]eal legal support" with "[s]atisfaction guaranteed":


Solar Cancellation Resource Center
July 16, 2025 ·

Think you're stuck with your solar contract?
Think again.
Many contracts can be challenged—and canceled—under consumer protection laws.
We know how.
100% legal support
Free contract review
Satisfaction guaranteed
Click the link in bio or send us a DM


Solar Cancellation Resource Center
July 11, 2025 ·

You were promised savings.
Instead, you got:
Higher bills
Hidden fees
No way out
We help homeowners cancel unfair solar contracts—LEGALLY.
Free contract review
Flat fee. No hidden costs.
Real legal support
DM us or visit solarcancellationrc.com

g. SCRC employees represent that SCRC has a "team of licensed attorneys," and that SCRC "uncover[s] legal issues that can give you a way out" through a "confidential case review":



Nick Pitts's Post

Nick Pitts
November 2 ·

If you signed a solar lease or loan and already regret it, you're not alone!

Thousands of homeowners were pressured into agreements that don't match the promises...

The truth is, these contracts are often written to make you feel trapped.

But being stuck isn't your only option!

At Solar Cancellation Resource Center, our team of licensed attorneys and former solar insiders reviews contracts just like yours

We uncover legal issues that can give you a way out (even when your installer or lender tells you otherwise).

Start with a free, confidential case review today and see if you are eligible.

No pressure. Just answers!

30. SCRC's "100% satisfaction guarantee," "100% favorable outcome," and similar advertisements are particularly deceptive, because they provide the false impression that SCRC can guarantee borrowers a legal, lawful, and risk-free exit from their solar loans. SCRC does not and cannot fulfill that promise. And even if SCRC was qualified to provide legal services (it is not), legal professionals are prohibited from making express guarantees regarding the results of their representations.

31. SCRC also attempts to manufacture credibility by falsely representing that SCRC has been "featured on" major national media outlets. On its website, SCRC displays the heading "OUR BUSINESS FEATURED

ON," followed by the statement "MAJOR MEDIA FOR FIGHTING SOLAR FRAUD," and then displays the logos of NBC, CBS, CNN, Forbes, Money, ABC, The Huffington Post, Los Angeles Times, MSNBC, The Wall Street Journal, The Economist, USA Today, Fox News Channel, Bloomberg, U.S. News & World Report, and The New York Times.




32. CALG makes the same type of representation on its own website. CALG displays the heading "AS SEEN IN" alongside the logos of Fox News Channel, Forbes, CNN, ABC, USA Today, and other media outlets.



33. SCRC also uses a "quiz" landing page in the lead-generation funnel that begins when Facebook users click on SCRC advertisements. That landing page is branded with SCRC's logo and states: "Start your Solar Cancellation Today!" The page asks, "Do you have a solar system you want to cancel?" and provides "Yes" and "No" response buttons to begin funneling the user towards retention. Immediately below the "Continue" button, the page states, without qualification: "No more Solar Payments!" The page also repeats the "featured" media coverage misrepresentations:



34. SCRC's "OUR BUSINESS FEATURED ON" representation and CALG's "AS SEEN IN" representation are false and misleading. Those statements, particularly when paired with the logos of major media organizations, inform viewers that SCRC and CALG have been independently featured, covered, interviewed, profiled, endorsed, or otherwise validated by those outlets. That is not true.

35. A diligent search of publicly available materials did not reveal a single article, broadcast segment, interview, video clip, publisher-created profile, or other editorial coverage by any of the listed media organizations featuring SCRC, CALG, or their solar-cancellation services.

36. These media-coverage representations are material. Defendants use them to create the false appearance that established, reputable, national media organizations have vetted or otherwise validated Defendants' businesses.

37. SCRC's "No more Solar Payments!" representation is also false and misleading. It is not a qualified statement communicating that a consumer may have legal claims, may be eligible to have their solar loan reviewed, or may obtain relief through a negotiated settlement or adjudication. It is an unqualified promise of a result: that the consumer will have "No more Solar Payments." Defendants cannot lawfully guarantee that result.

38. Moreover, the "No more Solar Payments!" representation is particularly deceptive because it appears at the conversion point of SCRC's advertising funnel, immediately after SCRC asks whether the consumer has a solar system the consumer wants to cancel and immediately before the consumer continues through the intake process. The statement is designed to induce consumers to believe that retaining Defendants will eliminate their payment obligations, thereby increasing the likelihood that consumers will stop making payments in connection with those obligations and refuse to communicate with their lenders, like GoodLeap.

39. SCRC markets directly to Florida borrowers by, for example, maintaining a website devoted to "Florida Solar Contract Cancellation," representing that it "serves homeowners throughout Florida – all 67 counties" (including the counties in this District), and maintaining a Facebook page specifically for "Florida homeowners":









40. Once SCRC lures in a potential customer using its deceptive advertisements, SCRC begins by conducting a free "legal" or "case" review. In reality, the review primarily functions as a sales screening: SCRC decides whether the homeowner is a profitable lead and then extracts an upfront or fixed fee from the homeowner that totals thousands of dollars, ranging from $4,500 on up.

41. As an example, a consumer complaint on the Better Business Bureau Scam Tracker reported that an SCRC representative "pretend[ed] to be a lawyer" to cancel a solar contract and sought an $8,000 payment:

> **Phishing - Lawyer Impostor**
>
> He pretend to be a lawyer to cancel our solar contract try to get my elderly mother to give her banking information to get a $8,000 payment from her
>
> Dollars Lost: $0.0
>
> Milton, WV- 25541
>
> Date Reported: September 26, 2025
>
> Business Name Used: Solar Cancellation Resource Center 3320 N Buffalo Dr Ste 208A Las Vegas NV 89129

42. Other public consumer reports describe fees in the $6,000 to $9,000 range, alongside false promises of favorable legal outcomes that never materialized.

43. This up-front fee structure gives SCRC an immediate financial incentive to sign up as many borrowers as possible, regardless of whether individualized legal relief is available.

44. As illustrated by a March 15, 2026 client complaint on SCRC's Better Business Bureau profile, after "retaining" clients, SCRC instructs or

encourages those clients to stop making payments on their solar loan agreements, based on the false premise that SCRC's "legal team" will resolve the matter, and that the cessation of payments is a necessary or legally justified "part [o]f the process" that "helps them settle faster."

**Initial Complaint** **Type:** Customer Service Issues

**Date:** 03/15/2026 **Status:** Answered

I am a client. When I singed my agreement I was advised to stop making my solar payments. I was told they would make sure my credit stayed in good standing, stopping my monthly payments was part if the process. After 30 day I received a notice that my payment was late and immediately called [redacted] to fix it. I called [redacted] services and they provided me with a number to call for a credit repair service they work with, [redacted] removed to late report but it was reported again after 60 days. I called the solar company and they stated that solar cancelation never contacted them to inform them of litigation so I called and spoke to a representative that assured me this would be escalated. We are suffering a lot of retaliation for this fraud and by Freedom and Mosaic. At this point I am getting frustrated because I feel like I am being scammed, this case is dragging on, I am being billed and me credit is being destroyed. I was notified today my once 789 credit score is now 543 and when I called the headquarters to get help with this I was informed I was on a "do not call list". Which causes further distress because the last time I spoke to them we ended on good terms.. I feel suicidal because my credit is now destroyed because of Solar Cancelations. I would have never stopped paying if they did not insist as "it helps them settle faster". The solar company left my home a fire hazard,

45. As another example, a former SCRC trainee corroborated the above-described process in a public comment on Facebook posted on or around August 15, 2025, remarking that SCRC "tell[s] the customers to stop paying their solar payments which can immediately cause your credit to tank."

How this company works: You have to sign a contract that will cost you no less than $5,000 and upwards of $10,000. At that point they'll have their attorney's (only one attorney, btw) legal team start trying to negotiate a settlement for you. Zero promises except that they'll stick with it for as long as it takes. They told us that it could take years to settle if at all. In the mean time you still have to pay them. They also tell the customers to stop paying their solar payments which can immediately cause your credit to tank. Don't worry, though, they'll help you with that, too...��.
Solar Cancellation Resource Center never paid me for the couple of days of training that I did. I trust them almost as far as I can throw the building they're in.

16w Like Reply Share Edited 16

46. SCRC's instruction or encouragement to stop paying solar loans harms SCRC's clients by, for example, driving down their credit scores and increasing the possibility that their loans could be accelerated and become fully due and payable.

47. Meanwhile, Defendants create the false appearance of legal action by informing borrowers that SCRC "represents" them, and that all communications from their solar lenders should be directed to SCRC. The borrowers then refuse to speak to their lenders, and SCRC likewise refuses to provide lenders with SCRC's client list, thereby completely cutting off lenders' ability to communicate directly with their own borrowers.

48. CALG has helped perpetuate this misleading scheme, including by sending boilerplate letters to lenders. These letters sent by CALG do not reflect individualized investigation or meaningful legal analysis. Instead, the letters are mass-produced tools intended to unlawfully sever solar lenders' contractual business relationships with their customers and create the false impression that legitimate legal proceedings are underway regarding those customers' loans, thereby discouraging those clients from continuing to make their monthly loan payments while SCRC waits for CALG to use the resulting delinquencies and defaults as settlement leverage.

49. Meanwhile, any prospective clients who reach out to CALG through CALG's website by providing their contact information are required to "review[] and accept the terms of use and privacy policy":

> By providing my contact details, I agree to receive marketing and customer care calls and text messages from Consumer Advocacy Law Group, including communications to provide status updates and notifications regarding my case or lawsuit, facilitate communication between the law firm and me about case details, as well as appointment confirmations, service updates, account alerts, and occasional promotional offers (if applicable). These communications may be delivered using automated technology or prerecorded messages. I confirm that I have reviewed and accept the terms of use and privacy policy. Message and data rates may apply. To opt out of future messages, reply STOP at any time. For assistance, reply HELP. Message frequency may vary, and you can unsubscribe at any time.

50. Although CALG's prospective clients are led to believe they are agreeing to CALG's "terms of use and privacy policy," the hyperlinks provided are actually to ***SCRC's*** terms and policies. Those terms and policies purportedly grant SCRC the authorization to, among other things, pull CALG's potential clients' credit information from consumer reporting agencies; communicate with CALG's potential clients, including by using automated technology and dialing systems; and collect potential clients' personal information.

51. CALG thus misleadingly induces its prospective clients to enter into contractual agreements with SCRC, presumably so that both entities can profit from them.

52. CALG and Fonbuena further use SCRC to evade their ethical obligations as attorneys. The "100% satisfaction," "100% favorable outcome," and similar guarantees that SCRC makes in connection with Defendants' scheme are of the type that lawyers are prohibited from making. Yet, CALG and Fonbuena are aware of and profit from that advertising.

53. Any suggestion that CALG is engaged in an innocent arms-length arrangement with SCRC is dispelled by the fact that SCRC, CALG, and Fonbuena all maintain an office at the same address: 3320 N. Buffalo Dr., Suite 208, Las Vegas, Nevada 89129. In addition, SCRC and CALG employees apparently share access to email addresses across company domains; for example, at least one CALG employee has access to and uses both clientservices@solarcancellationrc.com and clientservices@consumeradvocacy-law.com.

54. CALG receives financial benefits from SCRC in connection with this unlawful solar-loan-cancellation scheme. By accepting SCRC-generated leads, allowing SCRC to advertise legal services that reference CALG attorneys, and sending form letters that falsely suggest SCRC's sales pitch is

generating results for the client, CALG knowingly contributes to and materially participates in SCRC's false advertising and contract interference.

**C. SCRC and CALG Are Replicating Fonbuena's Past Unlawful Activities.**

55. SCRC and CALG's scheme is not new. CALG's CEO, Fonbuena, previously operated or promoted illegitimate contract-cancellation services in the timeshare industry through entities or brands including Fonbuena Law and Timeshare Defense Attorneys, where he was identified as a managing partner.

56. There has been extensive investigation into and litigation against timeshare-exit marketers and their affiliated law firms, including in this District and against Fonbuena himself. Those cases describe the same core mechanics at play here: false advertising of "legal" services; promises of guaranteed contract cancellation; the collection of hefty upfront consumer fees; attorney or law-firm branding to "legitimize" the operation; form demand letters; directions or incentives not to pay; and resulting defaults.

57. That is exactly what happened in *Wyndham Vacation Resorts, Inc. v. Timeshare Exit Hotline a/k/a Airtime Media, LLC*, No. 22-0674-WWB-DAB (M.D. Fla.) and *Capital Resorts Group, LLC v. Fonbuena Law Firm, CHTD*, No. 24-cv-03860-JD (D.S.C.). In *Wyndham*, the plaintiff sued Fonbuena personally, his law firm, and associated marketing entities in this District.

The action arose from Fonbuena's timeshare-exit enterprise, which apparently had the same architecture present here: a nonlawyer marketing company generates consumer-leads with exit promises; a law-firm label supplies legitimacy; consumers are steered away from paying and communicating with their lender; and form demand letters are used to manufacture the appearance that meaningful legal work is underway. That case quickly settled, and the Fonbuena defendants agreed to a sweeping injunction that would have permanently restrained them from, among other things, advising or inducing Wyndham customers to stop paying or breach their timeshare financial obligations and engaging in false or misleading advertising for timeshare-exit services. Fonbuena and his law firm agreed to a materially similar injunction in *Capital Resorts Group*.

58. Fonbuena, his law firm, and his marketing firm have also been the subject of multiple lawsuits alleging violations of the Telephone Consumer Protection Act of 1991 ("TCPA"). The plaintiffs in those lawsuits alleged Fonbuena's law firm or marketing firm placed pre-recorded and unsolicited telemarketing calls for purposes of promoting legal services. Like the timeshare cases, the TCPA cases were also quickly settled.

59. Defendants' current solar-cancellation enterprise thus appears to be built upon Fonbuena's past schemes, but this time with a new target: GoodLeap and its customers.

**D. SCRC Targets GoodLeap Customers and Has Harmed GoodLeap's Contractual Relationships.**

60. SCRC expressly targets GoodLeap customers as part of its scheme with CALG. For example, SCRC's public blog post titled "How to Get Out of a Solar Panel Contract: A Step-by-Step Guide for Homeowners," published on its website at solarcancellationrc.com, is addressed to readers that "owe a debt to a lender like GoodLeap" and directs those readers toward SCRC's services as a means of avoiding that debt. In that same post, SCRC instructs consumers to use the FTC Holder Rule to hold lenders like GoodLeap "responsible for the 'sins' or fraudulent misrepresentations made by the original solar installer"—which misleadingly suggests that GoodLeap customers can lawfully and permanently cease payments or eliminate their loan obligations with GoodLeap through Defendants' services and falsely suggests GoodLeap makes false representations to customers.

61. As another example, SCRC's public blog post titled "The 7 Most Common Solar Contract Complaints Homeowners File (And What Happens Next)" states that borrowers "cannot 'DIY' a cancellation against companies like GoodLeap or Sunnova using just a Google Search" but instead "need a team that has seen every trick in the book," such as SCRC.

> **Building E-E-A-T: Why Experience Matters**
>
> Experience, Expertise, Authoritativeness, and Trustworthiness (E-E-A-T) are not just SEO buzzwords; they are the requirements for successfully fighting a multi-billion dollar solar lender. You cannot "DIY" a cancellation against companies like GoodLeap or Sunnova using just a Google search. You need a team that has seen every trick in the book.
>
> At the **Solar Cancellation Resource Center,** our authority comes from our track record. We have audited thousands of contracts and identified the specific "legal triggers" that force these companies to let homeowners go.

62. These deceptive and false advertising efforts have worked by deceiving GoodLeap customers into purchasing Defendants' "services." Based on what CALG has told GoodLeap, the number of GoodLeap clients that have "retained" CALG has rapidly grown over just the past few months, with a significant number of those clients residing in Florida.

63. GoodLeap has attempted on numerous occasions to communicate with its clients that have fallen prey to SCRC and CALG's scheme. In numerous instances, GoodLeap's client has either failed to respond or has informed GoodLeap that any communications must be made through SCRC, demonstrating that they have in fact been misled by Defendants because they believe SCRC is their legal counsel. Meanwhile, SCRC has refused to communicate with GoodLeap on behalf of those individuals, obstructing GoodLeap's ability to work with its clients.

64. Further, the facts indicate that, once lured in by SCRC's false advertising, SCRC and/or CALG have directed or encouraged GoodLeap customers to stop paying their loans. To date, nearly 100 GoodLeap customers

have defaulted on their Loan Agreements right around the time CALG transmitted a form demand or cease-and-desist letter to GoodLeap, purportedly on behalf of those customers, including Florida clients. This includes multiple GoodLeap customers who reside in this District. Additional specific instances will be identified through discovery.

65. By way of example, one Florida customer who entered into a loan with GoodLeap in May 2022 stopped making loan payments on December 13, 2025, just eight days after CALG sent a cease-and-desist letter purportedly on her behalf on December 5, 2025.[1] That customer is now approximately 150 days delinquent on her loan, despite previously making payments for 3.5 years. Another Florida customer who obtained a GoodLeap loan in November 2021 stopped making loan payments on February 28, 2026, just 11 days before CALG sent a cease-and-desist letter purportedly on her behalf on March 10, 2026. That customer is now over 70 days delinquent on her loan, despite previously making payments for over 4 years. These and other customers have breached their Loan Agreements with GoodLeap as a direct result of Defendants' scheme, as demonstrated by the timing of when the customers breached their agreements with GoodLeap relative to when CALG sent boilerplate letters to GoodLeap purportedly on their behalf.

[1] Due to privacy concerns, all GoodLeap customers' personal identifying information—including their name, address, and loan number—has been omitted.

66. The above-described pattern of delinquent payments on GoodLeap loans occurring right around the time that GoodLeap customers have "retained" Defendants is consistent with Defendants' own advertising. For example, SCRC's "No more Solar Payments!" representation suggests to GoodLeap customers that SCRC's process will result in those customers having "No more Solar Payments." That message reinforces Defendants' broader scheme of inducing GoodLeap customers to stop paying GoodLeap and to refuse direct communications with GoodLeap.

67. Defendants' media-coverage representations likewise contribute to GoodLeap's injury by making Defendants' scheme appear legitimate and trustworthy. GoodLeap customers who otherwise might question whether SCRC, a non-law-firm marketing entity, can lawfully provide the promised solar-loan cancellation services are falsely reassured by its claim that it has been "featured on" well-known national media outlets. The same is true for any GoodLeap customers who may navigate to CALG's website.

68. As a direct and proximate result of SCRC's and CALG's scheme, GoodLeap has suffered and continues to suffer substantial financial harm. Defendants' false and misleading representations have caused GoodLeap direct financial losses through foregone revenue, increased servicing costs, and the expense of attempting to communicate with and re-engage customers who have been insulated by Defendants.

69. GoodLeap has also suffered and continues to suffer substantial harm to its business reputation, relationships with its clients, and goodwill. Defendants' scheme is specifically designed to insert SCRC between GoodLeap and its own customers, preventing GoodLeap from communicating with customers about their account status, addressing legitimate customer concerns, or assisting customers in resolving any issues with their solar installations. GoodLeap customers who have been told they are legally represented by SCRC have refused to engage directly with GoodLeap, even when doing so would serve those customers' own interests by enabling GoodLeap to properly service their loans as it intended.

70. In addition, SCRC's advertising characterizes GoodLeap's loan products and the solar financing industry broadly in a negative and misleading light, suggesting to consumers that they should walk away from their contractual obligations with legitimate solar lenders like GoodLeap. This narrative, disseminated through SCRC's website and social media advertising, damages GoodLeap's reputation in the marketplace and undermines consumer confidence in GoodLeap's products and services.

71. GoodLeap's losses will continue to escalate unless Defendants are enjoined from continuing their deceptive and unfair practices.

72. In light of this ongoing harm to GoodLeap, GoodLeap requests a speedy hearing of its claims pursuant to Federal Rule of Civil Procedure 57.

## V. CAUSES OF ACTION

**Count I**

**False Advertising in Violation of the Lanham Act,**
**15 U.S.C. § 1125(a)(1)**
(*Against SCRC*)

73. GoodLeap realleges and incorporates by reference the allegations in paragraphs 1, 3–5, 7–12, 14–15, 22–31, 33–47, 55–57, and 59–71, which describe SCRC's identity as a non-law-firm entity; SCRC's false and misleading commercial advertisements; those advertisements' dissemination in interstate commerce, including in Florida; the fees SCRC collects from consumers in reliance on those advertisements; SCRC's express targeting of GoodLeap customers; the resulting deception of those customers and their cessation of loan payments; and the direct financial and reputational harm to GoodLeap.

74. SCRC has willfully, deliberately, and egregiously made false and misleading statements of fact in commercial advertisements that are intended to mislead consumers by, for example, suggesting that it provides legal services that can lawfully cancel or invalidate the consumers' loans with solar lenders like GoodLeap, that retaining SCRC will mean "No more Solar Payments!", that SCRC has been "featured on" major media outlets, and that its services have "100%" "guaranteed" and "favorable" results. SCRC, however, is not licensed to practice law. Nor can SCRC "guarantee" consumers a legal exit

from their loans with GoodLeap. As a result, such advertisements are false, either on their face or by necessary implication.

75. SCRC's advertising is disseminated nationally via the internet and social media and directly targets consumers across state lines, including in Florida. Accordingly, SCRC's conduct is squarely within interstate commerce as required by 15 U.S.C. § 1125(a).

76. SCRC's false and misleading statements constitute commercial speech made by SCRC that is intended to target and divert GoodLeap's and other solar lenders' existing customer relationships for SCRC's own financial gain.

77. SCRC's false and misleading advertising has deceived and has the capacity to deceive a substantial segment of the consuming public, including GoodLeap's customers and potential customers, as evidenced by the fact that multiple GoodLeap customers have failed to make payments on their loans with GoodLeap, citing SCRC's purported legal representation of them.

78. SCRC's deception is material, in that consumers are induced by these false representations to retain SCRC's services, to stop making payments to GoodLeap, and to refuse direct communications with GoodLeap—none of which they would do absent SCRC's false assurances of legal representation and guaranteed favorable outcomes.

79. SCRC's false and misleading advertising directly harms GoodLeap by inducing GoodLeap's customers to breach their Loan Agreements, by diverting customer relationships away from GoodLeap, and by causing GoodLeap direct financial losses and reputational harm. GoodLeap's injuries are within the "zone of interests" protected by the Lanham Act because they constitute injuries to GoodLeap's commercial interests in sales and reputation.

80. GoodLeap is a direct target and foreseeable victim of SCRC's false advertising. SCRC's advertising and blog content specifically identify GoodLeap or borrowers who owe debts to lenders like GoodLeap, and SCRC's revenue depends on those borrowers ceasing or threatening to cease performance under GoodLeap Loan Agreements.

81. SCRC's statements are not merely aspirational or puffery. They are specific representations about the source, nature, characteristics, and quality of SCRC's services—namely, that the services are attorney-led, legally supported, and capable of cancelling or invalidating binding solar loan obligations.

82. Pursuant to 15 U.S.C. § 1117, GoodLeap is entitled to recover: (1) its actual damages sustained as a result of the false advertising; (2) SCRC's profits resulting from its false advertising; and (3) the costs of this action.

83. Pursuant to 15 U.S.C. § 1116, GoodLeap seeks a permanent injunction to prevent further violations by SCRC of 15 U.S.C. § 1125(a).

## Count II

**Contributory False Advertising in Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)**
(*Against CALG*)

84. GoodLeap realleges and incorporates by reference the allegations in paragraphs 1–12, 14–16, 22–57, and 59–71, which describe SCRC's false and misleading advertising; CALG's referral arrangement with SCRC and resulting financial incentive to encourage that advertising; CALG's false and misleading advertising to further perpetuate Defendants' scheme; CALG's transmission of boilerplate demand letters that lend legitimacy to SCRC's scheme; CALG's knowing use of SCRC to interface with clients; CALG's awareness of SCRC's false and misleading advertising; and the harm to GoodLeap resulting from Defendants' combined conduct.

85. As described above, and in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1), SCRC has willfully and egregiously made false and misleading statements of fact in commercial advertisements and intended to mislead consumers, causing injury to GoodLeap.

86. CALG has contributed and continues to contribute to SCRC's false and misleading advertising by knowingly inducing or causing the conduct, or by materially participating in it in at least the following ways:

(a) By entering into and operating pursuant to a referral arrangement with SCRC that rewards both Defendants based on volume of clients

generated, which financially incentivizes aggressive, false and misleading advertising by SCRC;

(b) By misleading potential clients using false and misleading advertising on its own website;

(c) By misleading potential clients to enter into contractual agreements with SCRC;

(d) By knowingly accepting client referrals and receiving compensation generated by SCRC's false and misleading advertising;

(e) By knowingly permitting SCRC to instruct or otherwise misleadingly suggest to CALG's purported clients that they are being legally represented by SCRC;

(f) By knowingly permitting SCRC to direct the course of purported legal representation between CALG and its purported clients; and

(g) By sending boilerplate demand letters to GoodLeap on behalf of clients recruited through SCRC's false advertising, thereby lending a further appearance of legitimacy to SCRC's scheme and reinforcing the false impression held by clients that legal proceedings are underway on their behalf.

87. CALG explicitly or implicitly encourages SCRC's false advertising because its business—including the client referrals and associated fees that

CALG receives in connection with the above-described scheme—depends on and derives from SCRC's false and misleading marketing activities.

88. CALG has full knowledge of the nature of SCRC's false and misleading advertising. CALG cannot claim ignorance of SCRC's false advertising given that, for example, the advertising is public, widespread, and the very mechanism by which CALG receives clients.

89. CALG financially benefits from SCRC's false advertisements in the form of client referrals and fees paid by or through those clients. Much, if not all, of CALG's revenue from solar loan cancellation matters derives from consumers solicited through SCRC's false and misleading advertising.

90. Pursuant to 15 U.S.C. § 1117, GoodLeap is entitled to recover: (1) its actual damages sustained as a result of the false advertising; (2) CALG's profits resulting from its contributory participation in SCRC's false advertising; and (3) the costs of this action.

91. Pursuant to 15 U.S.C. § 1116, GoodLeap seeks a permanent injunction to prevent further contributory violations by CALG of 15 U.S.C. § 1125(a).

## Count III

**Violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 et seq.**
(*Against SCRC and CALG*)

92. GoodLeap realleges and incorporates by reference the allegations in paragraphs 1–12, 14–16, 22–57, and 59–71, which describe Defendants' engagement in trade or commerce in Florida; SCRC's false and misleading advertisements; CALG's participation in the scheme, including through boilerplate demand letters designed to sever GoodLeap's communications with its customers; Defendants' knowledge that their conduct was deceptive; and the direct financial losses and ongoing irreparable harm to GoodLeap caused by Defendants' deceptive and unfair practices.

93. Defendants are engaged in "trade or commerce" as that term is defined by FDUTPA. As alleged above, SCRC advertises, sells, and collects fees for purported solar contract and solar loan legal cancellation services to consumers in Florida and across the country. As alleged above, CALG directly participates in this scheme, including by, for example, sending boilerplate demand letters to solar lenders that are designed not to achieve legal results for SCRC's clients, but instead are intended to cut off communications between those borrowers and their lenders and create the false impression that legitimate legal proceedings are underway regarding those borrowers' loans.

94. GoodLeap is an "interested party or person" as that term is defined by Fla. Stat. § 501.203(6), because Defendants' deceptive and unfair practices have caused and continue to cause GoodLeap to suffer actual losses.

95. As described in more detail above, Defendants have engaged in deceptive and unfair acts and practices in the State of Florida.

96. As described in more detail above, Defendants knew or should have known that their conduct was deceptive and unfair. Defendants intended that SCRC's false representations would induce consumers to rely on them and act accordingly—including by retaining SCRC's services and ceasing payments to GoodLeap without full knowledge of the possible legal ramifications of that behavior.

97. Defendants' conduct constitutes unconscionable commercial practices, deception, fraud, false pretenses, misrepresentation, and the knowing concealment and suppression of material facts, all in violation of FDUTPA.

98. As a direct and proximate result of Defendants' deceptive and unfair conduct, GoodLeap has suffered financial losses, because Defendants' deceptive acts caused GoodLeap's Florida-based customers to stop making payments on their Loan Agreements.

99. Defendants' deceptive and unfair conduct has caused, and if not enjoined will continue to cause, irreparable harm to GoodLeap through the

ongoing disruption of its customer and contractual relations. GoodLeap does not have an adequate remedy at law to fully address the harm caused by Defendants' continuing course of conduct.

100. Pursuant to Fla. Stat. §§ 501.2105 and 501.211, GoodLeap is entitled to a permanent injunctive relief to prevent future violations, declaratory relief, actual damages, and recovery of attorneys' fees and costs.

## **Count IV**

### Tortious Interference with Contractual Relations
(*Against SCRC and CALG*)

101. GoodLeap realleges and incorporates by reference the allegations in paragraphs 1, 7–12, 14–16, 22–25, 27–36, 39–48, 52–57, and 59–71, which describe GoodLeap's valid and enforceable Loan Agreements with its customers; Defendants' actual and constructive knowledge of those agreements through SCRC's deliberate targeting of GoodLeap customers; Defendants' intentional conduct in instructing GoodLeap customers to cease loan payments and refuse communications with GoodLeap; the resulting defaults by GoodLeap customers; and the financial harm and damage to customer relationships suffered by GoodLeap.

102. GoodLeap has valid and existing contractual relationships with its customers in the form of binding Loan Agreements. These Loan Agreements are valid and enforceable contracts.

103. SCRC and CALG have actual and constructive knowledge of the Loan Agreements between GoodLeap and its customers. Indeed, the very basis of SCRC's business model is to target individuals who are parties to solar loan agreements, including GoodLeap's Loan Agreements, as evidenced in part by SCRC's decision to specifically name GoodLeap as a solar lender on its website.

104. SCRC and CALG have acted intentionally and in a manner designed to disrupt, and that has disrupted the contractual relationships between GoodLeap and its customers. For example, SCRC and CALG have instructed GoodLeap customers to stop making payments on their Loan Agreements, in violation of the terms of those Agreements that set forth the agreed-upon loan payment terms; have insulated those customers from direct communications with GoodLeap; and have induced those customers to breach their contracts. SCRC and CALG intentionally engaged in this improper and unlawful conduct for their personal gain.

105. These intentional acts have resulted in actual disruption of GoodLeap's contractual relationships. GoodLeap's customers, including numerous GoodLeap customers located in Florida, stopped making loan payments around the same time CALG transmitted demand letters to GoodLeap purportedly on their behalf, resulting in delinquency on their Loan Agreements.

106. GoodLeap has suffered resulting damage, including lost loan payments, increased servicing costs, costs associated with attempting to re-establish contact with affected customers, and harm to GoodLeap's ongoing customer relationships and business goodwill.

107. Defendants' conduct is intentional, willful, and malicious, and entitles GoodLeap to an award of punitive damages.

**108.** GoodLeap is entitled to damages against SCRC and CALG jointly and severally.

**Count V**

**Civil Conspiracy**
(*Against SCRC and CALG*)

109. GoodLeap realleges and incorporates by reference the allegations in paragraphs 1–12, 14–16, 22–30, 37–57, and 59–71, which describe the coordinated scheme between SCRC and CALG, including their shared office address and intermingled personnel, SCRC's dissemination of false and misleading advertising, CALG's acceptance of referrals and transmission of boilerplate demand letters in furtherance of the scheme, Fonbuena's prior use of the same scheme against timeshare companies, and the resulting breach of GoodLeap's customer contracts and financial harm to GoodLeap.

110. SCRC and CALG have entered into an agreement, express or implied, to engage in an unlawful scheme: specifically, to falsely hold SCRC

out as a provider of attorney-led legal services; to induce solar loan borrowers, including GoodLeap's customers, to cease making payments on their valid and enforceable Loan Agreements; and to tortiously interfere with GoodLeap's contractual relationships with its customers—all for their mutual financial gain.

111. As discussed above, SCRC and CALG have committed overt acts in furtherance of this conspiracy, including but not limited to SCRC's dissemination of false and misleading advertisements across the internet and social media, falsely representing that it provides attorney-led legal services and guaranteeing favorable consumer outcomes; SCRC's instruction to GoodLeap customers to stop making payments on their Loan Agreements and to refuse direct communications with GoodLeap; CALG's acceptance of referrals from SCRC and decision to enter into fee arrangements that directly depend on and are funded by SCRC's false advertising scheme; CALG's requirement that potential clients enter into contractual agreements with SCRC; and CALG's transmission of boilerplate demand letters to GoodLeap designed to cut off GoodLeap's communications with its customers and to further the false impression that legal proceedings are being pursued on behalf of SCRC's clients.

112. Neither Defendant could accomplish this scheme without the other. SCRC's advertising of attorney-led services and guaranteed favorable

legal outcomes would immediately be exposed as false without CALG's willingness to accept referrals and send letters purportedly on behalf of SCRC's clients. And CALG benefits from the scheme through the client referrals and fees generated by SCRC's false and misleading advertising.

113. As a direct and proximate result of the conspiracy, GoodLeap customers have breached or ceased performing their contractual obligations, GoodLeap has suffered financial losses, and GoodLeap has been unable to communicate with and effectively service loans for its own customers.

114. As described above, SCRC and CALG acted willfully and with malice in furtherance of their conspiracy, and their conduct entitles GoodLeap to an award of punitive damages.

115. Defendants are jointly and severally liable to GoodLeap for all damages caused by their conspiracy.

## Count VI

### Unauthorized Practice of Law
(*Against SCRC*)

116. GoodLeap realleges and incorporates by reference the allegations in paragraphs 1, 3–5, 7–9, 11–12, 14–15, 22–30, 37–47, 55–57, and 59–71, which describe SCRC's status as a non-law-firm entity that employs no licensed attorneys; its solicitation of Florida consumers through Florida-specific advertising markets as providing attorney-backed legal case review

and representation; its collection of fees from consumers who believe they are receiving legal representation; its control of all client communications and direction of the purported representation; and the resulting harm to GoodLeap from customers ceasing loan payments in reliance on SCRC's unauthorized legal advice.

117. SCRC is not a law firm. It does not employ licensed attorneys and is not subject to the Rules of Professional Conduct that govern the practice of law in Florida or any other jurisdiction.

118. Despite this, SCRC advertises its purported provision of legal services and guarantees favorable legal results by holding itself out as providing legal services and charges fees for those purported services. For example, SCRC's advertisements market SCRC as providing potential customers—including GoodLeap customers in Florida—with a legally viable basis to cancel or escape their loan obligations. As another example, SCRC's advertisements hold SCRC out as conducting what it calls "legal" or "case" reviews of consumers' Loan Agreements. As yet another example, SCRC's "No more Solar Payments!" representation communicates a purported legal conclusion about consumers' payment obligations: that consumers can stop making solar-loan payments or will no longer owe them. But that representation necessarily depends on the application of legal principles to

consumers' contractual obligations, yet SCRC is not a law firm and is not authorized to provide legal advice.

119. SCRC charges consumers substantial fees for these services, in amounts ranging from approximately $4,500 to $9,000, which consumers pay on the understanding that they are receiving attorney-backed legal representation.

120. SCRC controls all aspects of the client relationship: it screens cases, communicates with clients, and directs the course of the purported representation, all without meaningful attorney involvement.

121. SCRC's conduct in Florida constitutes the unauthorized practice of law. SCRC has solicited Florida consumers, including GoodLeap customers, through its nationwide advertising, Florida-specific advertising, and Florida-specific Facebook page, and that advertising markets SCRC's purported legal case review, legal representation, and legal resolution of consumers' solar loan obligations.

122. As a direct and proximate result of SCRC's unauthorized practice of law, GoodLeap has suffered harm, including lost loan payments from customers who have ceased making payments in reliance on SCRC's unauthorized legal advice and the false assurance of legal representation.

123. GoodLeap is entitled to recover from SCRC its damages and attorneys' fees and costs resulting from SCRC's unauthorized practice of law.

**Count VII**

**Declaratory Judgment**
(*Against SCRC and CALG*)

124. GoodLeap realleges and incorporates by reference the allegations in paragraphs 1–12, 14–16, 22–57, and 59–71, which describe Defendants' ongoing scheme of advertising, selling, and collecting fees for purported solar loan cancellation services, the actual and continuing harm that scheme has caused GoodLeap, and Defendants' refusal to abate their practices, establishing the bona fide, immediate, and justiciable controversy as to whether Defendants' conduct constitutes false and misleading advertising under the Lanham Act and deceptive and unfair trade practices under FDUTPA.

125. Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, a court may declare the rights and other legal relations of any interested party in the case of an actual controversy within its jurisdiction.

126. There exists a substantial justiciable controversy between the parties as to whether Defendants' scheme described above violates FDUTPA. GoodLeap further contends there is a substantial justiciable controversy as to whether Defendants' scheme violates the Lanham Act, 15 U.S.C. § 1125(a). GoodLeap believes Defendants' scheme constitutes a deceptive and unfair practice under FDUTPA and false advertising and contributory false

advertising under the Lanham Act, but Defendants disagree and refuse to abate the deceptive and unfair practice. This Court is thus vested with the power to declare the rights and liabilities of the parties, and to grant such other and further relief as may be necessary. Declaration of the parties' rights in these regards will clarify the rights and interests of the parties.

127. Given the prior and ongoing harm caused by Defendants' misconduct, the controversy between the parties is actual and of sufficient immediacy to warrant the issuance of a declaratory judgment. As alleged in the preceding paragraphs, Defendants' practices cause substantial harm to GoodLeap, such that there is a bona fide, actual, present need for the declaration.

128. Declaratory relief will resolve the legal issues between the parties regarding whether Defendants' scheme constitutes a deceptive practice under FDUTPA and false advertising and contributory false advertising under the Lanham Act, 15 U.S.C. § 1125(a).

129. GoodLeap has attempted to engage with Defendants as to the issues with its above-described conduct, but Defendants have nevertheless continued those practices.

130. Therefore, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, GoodLeap requests a judgment declaring that Defendants' scheme of advertising, selling, and collecting fees for purported solar contract and solar

loan legal cancellation services is a deceptive practice under FDUTPA and false advertising and contributory false advertising under the Lanham Act, 15 U.S.C. § 1125(a).

131. Given that Defendants' scheme presents ongoing harm to GoodLeap, pursuant to Federal Rule of Civil Procedure 57, GoodLeap requests a speedy hearing of this claim.

## VI. REQUEST FOR RELIEF

Plaintiff prays for judgment against Defendants as follows:

1. Actual damages suffered by GoodLeap as a result of Defendants' unlawful conduct;
2. Disgorgement of SCRC's profits obtained through its unlawful conduct;
3. Punitive damages against SCRC and CALG for their intentional, willful, and malicious conduct;
4. Entry of permanent injunctive relief against SCRC and CALG, as well as their agents, representatives, employees, and affiliates, prohibiting Defendants from:

    (i) publishing or disseminating any advertisement that falsely represents that SCRC provides attorney-led or attorney-provided legal services, guarantees successful contract

cancellation, or can legally cancel or invalidate solar loan agreements;

(ii) instructing, advising, or encouraging GoodLeap's customers to stop making payments on their Loan Agreements;

(iii) interfering with GoodLeap's ability to communicate with its own customers; and

(iv) engaging in the unauthorized practice of law;

5. Speedily declare pursuant to Federal Rule of Civil Procedure 57 that Defendants' practices violate FDUTPA and constitute false advertising and contributory false advertising under the Lanham Act, 15 U.S.C. § 1125(a);
6. Costs of suit;
7. Pre- and post-judgment interest as permitted by law; and
8. Such other and further relief as the Court may deem just and proper.

## VII. DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, GoodLeap demands trial by jury in this action to all issues so triable.

Dated: October 2, 2026

Respectfully submitted,

By: _/s/ *Michael J. Holecek*________

Michael J. Holecek
Florida Bar No.: 1035950
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
MHolecek@gibsondunn.com
Tel: +1 213.229.7000

Orin S. Snyder
New York Bar No.: 2116424 (*pro hac vice* forthcoming)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
OSnyder@gibsondunn.com
Tel: +1 212.351.4000

Debra Wong Yang
California Bar No.: 123289 (*pro hac vice* forthcoming)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
DWongYang@gibsondunn.com
Tel: +1 213.229.7000

Jillian N. London
California Bar No.: 319924 (*pro hac vice* forthcoming)
GIBSON, DUNN & CRUTCHER LLP
2000 Avenue of the Stars, Suite 1200N
Los Angeles, CA 90067-4700
JLondon@gibsondunn.com
Tel: +1 310.552.8500

*Attorneys for Plaintiff GoodLeap, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 2, 2026, I caused the foregoing to be electronically filed with the Clerk of the Court by using the CM/ECF system.

*/s/ Viola H. Li*
Viola H. Li